**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**(Civil Division)**

|  |  |
|---|---|
| CARMEN R. EFRE<br>2700 South Woodlands Village Blvd, #300-275<br>Flagstaff, Arizona 86001<br><br>*Plaintiff*,<br><br>v.<br><br>ALEJANDRO MAYORKAS, Secretary,<br>U.S. Department of Homeland Security,<br>2707 Martin Luther King Avenue, SE<br>Washington, DC 20528-0525<br><br>*Defendant*. | Civ. Action No.<br>**(Jury Demanded)** |

## COMPLAINT

The Plaintiff, Carmen Efre, by and through undersigned counsel, hereby files suit against the named Defendant for the causes of action stated as follows:

### I.  INTRODUCTION

1. Plaintiff Carmen R. Efre ("Plaintiff" or "Ms. Efre") brings this civil action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, ("Title VII"); 42 U.S.C. 1981a; and the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701, *et seq.* ("Rehabilitation Act") for relief from discrimination, retaliation and hostile work environment based on race (Puerto Rican), national origin (Hispanic), sex (Female), color (Dark), religion (Santeria), disability (physical) and engagement in protected EEO activity, resulting in the deterioration of Plaintiff's health and well-being and substantial damage to Plaintiff's career and retirement benefits.

1

## II.   JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to the federal antidiscrimination statutes asserted herein.  Further, this Court has jurisdiction over this Complaint because there is diversity of the parties and presents a question of federal law.  28 U.S.C. §§ 1331 (federal question) and 1332 (diversity).

3. Venue properly lies within this Court pursuant to 28 U.S.C. § 1391, 42 U.S.C. § 2000e-5(f)(3).  Secretary Mayorkas', as Secretary for the U.S. Department of Homeland Security, office is headquartered within the District of Columbia.

## III.   PARTIES

4. Ms. Efre is domiciled at 2700 South Woodlands Village Boulevard, #300-275, Flagstaff, Arizona 86001. At all relevant times, Ms. Efre was an employee of U.S. Department of the Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE", "the Agency" or "Defendant").  During the relevant time period, she worked as Defendant's employee within the meaning of Title VII and the Rehabilitation Act.

5. Hon. Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security, is named in his official capacity only.

6. Defendant is subject to suit for the negligent, discriminatory, wanton, willful or wrongful acts and/or omissions of employees or agents of Defendant; in addition, Defendant is the employer of persons who have committed negligent, discriminatory acts and/or omission against Plaintiff within the course and scope of her employment. Therefore, Defendant is liable pursuant to the doctrine of *respondeat superior*.

## IV.   PROCEDURAL HISTORY

7. Plaintiff has exhausted all her administrative remedies.

8. On or about November 20, 2014, Plaintiff timely initiated EEO contact. Her EEO complaint was assigned as Agency No. HS-ICE-02307-2015.

9. On or about February 18, 2015, Plaintiff timely filed a formal EEO complaint for discrimination, retaliation and harassment from July 2014 – October 2014 based on her race (Puerto Rican), national origin (Hispanic), sex (Female) and color (Dark).

10. On or about June 23, 2015, the Agency began its investigation into Plaintiff's EEO complaints. The Report of Investigation ("ROI") was completed on or about December 10, 2015.

11. The Defendant issued its Final Agency Decision ("FAD") on or about October 21, 2021.

12. Plaintiff timely appealed the FAD to the Equal Employment Opportunity Commission ("EEOC") Office of Federal Operations ("OFO"), which rendered its decision on December 13, 2022.

13. Plaintiff timely filed a Request for Reconsideration on January 12, 2022, with the OFO, which issued its decision on May 16, 2023, which provided Plaintiff 90 days from receipt to file a federal court complaint.

14. On or about January 30, 2018, Plaintiff timely initiated EEO contact. Her EEO complaint was assigned as Agency No. HS-ICE-00995-2018.

15. On or about April 13, 2018, Plaintiff timely filed a formal EEO complaint for discrimination, retaliation and harassment from January 2017 – March 2018 based on her sex (Female), religion (Santeria), disability (physical) and engagement in prior EEO activity.

16. On or about February 22, 2021, Plaintiff received a copy of the Agency's FAD.

17. On or about March 22, 2022, Plaintiff appealed the FAD to the OFO, which issued a decision August 3, 2022.

18. Plaintiff filed for reconsideration from which the OFO, which issued a decision on February 27, 2023. The OFO's Order provided Plaintiff 90 days from receipt of its Order to file this matter in federal district court.

19. On or about July 31, 2022, Plaintiff timely initiated EEO contact. Her EEO complaint was assigned as Agency No. HS-ICE-02710-2022.

20. On or about August 19, 2022, Plaintiff timely filed a formal EEO complaint for discrimination and retaliation based on her disability (physical / failure to accommodate) and engagement in prior EEO activity when, on or about July 8, 2022, she learned her reasonable accommodation request was denied.

21. The ROI was issued to the Agency on or about March 1, 2023. Plaintiff received a copy on or about March 8, 2023.

22. To date, Plaintiff has not received a Final Agency Decision on Agency No. HS-ICE-02710-2022.

23. Plaintiff now timely files her federal district court complaint.

## V.   FACTS

24. Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

25. Plaintiff has been employed by the Defendant since about December 2006. She was initially employed by the U.S. Customs and Border Patrol ("CBP"), and on or about May 2010, she transferred to the U.S. Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operations ("ERO"). In November 2018, Plaintiff transferred

to with the U.S. Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), where she is currently employed as a Criminal Investigator, GS-1811-13.

26. Plaintiff's current first-level supervisor is Mitchell Worley, Resident Agent in Charge ("RAC").

27. Plaintiff's current second-level supervisor is Melissa Ruiz, Assistant Special Agent in Charge ("ASAC").

28. In Spring 2014, Plaintiff was sent to the ICE Academy.

29. While at the Academy, Plaintiff was repeatedly reminded that she was not the desired standard (*i.e.*, White, American, and/or male). She was questioned about her marital status and encouraged to socialize with her male counterparts. Upon information and belief, her male counterparts were not equally encouraged to socialize with their female counterparts or questioned about their marital status.

30. While at the Academy, Plaintiff was required to perform pushups. However, only Plaintiff and B.T.T. (African American, female, dark, African) were that required to adhere to a specific form - breasts to touch the floor, no rear end was sticking out and legs not permitted to touch the floor. Failure to perform this pushup would count against her and the pushup would not count toward the required amount. Two other Caucasian trainees (non-Hispanic, non-Puerto Rican) – one male and one female - were taking the same PFT were not given the same instruction or had Instructors on the floor, watching to see if their breasts touched the floor.

31. Additionally, Plaintiff overheard one male Instructor, Hector Marin, complain that everyone needed to keep running because of the "girls", which was stated in a demeaning and condescending tone. She was further warned not to call her friends at Headquarters

because "we don't like those kind of people," which was also stated in a denigrating tone. Plaintiff interpreted "those kind of people" meant people like her – people of Hispanic descent and/or Puerto Rican.

32. On or about July 31, 2014, Instructor Hector Marin further yelled insults at her in English. When she did not immediately respond, those same insults were also spewed in Spanish and Plaintiff was questioned as whether she understood English. None of the other non-Hispanic, non-Puerto Rican trainees were similarly yelled at or accused of not speaking or understanding English.

33. Unlike her counterparts (male, non-Puerto Rican, non-Hispanic), Plaintiff was further singled out, with the intention of intimidating Plaintiff, when a pocket knife was opened in front of her face by Instructor Charles Tortorette (White, male, national origin unknown). In front of the entire class and using that knife, Mr. Tortorette then cut her duty belt, threw it on the ground and across the room and ordered her to pick it back up. Humiliated, Plaintiff did as she was ordered.

34. Shortly thereafter, on or about August 13, 2014, Section Chief Charles Dean (White, male) yelled at her while he was pushing/pulling her and carelessly grabbing for the loaded weapon holstered on her hip while yelling he will "teach her a lesson." While she was being pushed and pulled, Plaintiff was standing right next to other trainees, who were firing live rounds. Had she lost her balance, it was highly probable that she would have been shot. Another Instructor was required to intervene and stop Mr. Dean. Mr. Dean did not similarly assault the male trainees.

35. On or about September 9, 2014, Plaintiff and another trainee B.T.T. (African American, female, dark, African) met with Unit Chief Jack Bonner to complain about the double standards they were experiencing by the Academy Instructors. Mr. Bonner dismissed

their complaints and proceeded to make disparaging comments about Hispanic women, which included statements that men look down on Hispanic women. Namely, "men like me do not like Hispanic women like you and we do not like to sit next to you in airplanes." During this meeting, Mr. Bonner admitted that female trainees needed to be treated differently and more harshly in order to ensure they developed "thicker skin".

36. Mr. Bonner later threatened to ensure both Plaintiff and B.T.T. fail the Immigration Enforcement Agent ("IEA") Academy and further threatened to get them fired from federal service. When she was dismissed from the Academy in 2019, Mr. Bonner was still working there.

37. Mr. Bonner identifies as a White, Hispanic, male. However, from Plaintiff's visual inspection, he appears to look more of an Irish descent as opposed to Hispanic descent.

38. During her employment with Defendant, Plaintiff has suffered several on-the-job injuries, including injury to her right upper limb, lesion on her upper nerve, strain on her lower leg and tendons, knee sprain, tendinitis, lumbar strain with leg radiculopathy, lower back injuries and compartment syndrome. While Plaintiff's Department of Labor, Office of Workers' Compensation Programs ("OWCP") and ICE Workers' Compensation cases were pending, Plaintiff would periodically need to take leave to manage the pain or obtain treatment for those injuries. In such cases, Agency policy permits its employees to take OWCP LWOP, which enables an employee to eventually be compensated for any lost wages attributed to the OWCP claim(s).

39. Plaintiff's supervisors have used her OWCP claims and medical conditions as yet another means to harass and unjustly target Plaintiff. For example, Marla Jones, Plaintiff's then-immediate supervisor, repeatedly denied Plaintiff the opportunity to telework or work any other alternative work schedule, as an accommodation to recover from her injuries. Other

individuals within her organization (non-Hispanic, non-Puerto Rican, male, no EEO activity and/or no disability) have been permitted to telework or work an alternative work schedule. When denying her telework or alternate work schedule, no one with the Defendant engaged in any discussion with Plaintiff to determine any other effective reasonable accommodation.

40. In January 2017, Ms. Jones repeatedly insisted that Plaintiff tell her why she wanted to visit Cuba, which was for religious purposes, and reminded Plaintiff that a promotion was contingent upon her performance appraisal.

41. In February 2017, Ms. Jones told Plaintiff that she was prohibited from wearing dresses to work because she did not like how the shape of Plaintiff's body looked in dresses and, again, reminded Plaintiff that a decision on whether she would receive a promotion was forthcoming.

42. In April 2017, after Plaintiff declined Ms. Jones' request that Plaintiff be her personal trainer, Ms. Jones delayed approval of her form requesting outside employment. Other individuals within her organization (non-Hispanic, non-Puerto Rican, male, no EEO activity and/or no disability) have had their outside employment forms approved.

43. In May 2017, Plaintiff's request to telework on dates in approximately May 2017, was denied.

44. In June 2017, Ms. Jones demanded Plaintiff stand next to her so she could smell Plaintiff's perfume from Plaintiff's neck, instead of her wrist. Plaintiff immediately left Ms. Jones office.

45. In August 2017, Ms. Jones placed her hand on Plaintiff's leg, without Plaintiff's consent. When this occurred, Plaintiff was wearing a skirt and sitting at her desk working. Plaintiff

8

attempted to move out of Ms. Jones path but Ms. Jones obstructed her ability to move away and touched her leg a second time.

46. In September 2017, Plaintiff was ordered to take LWOP when she requested OWCP LWOP.

47. In November 2017, Ms. Jones changed Plaintiff's OWCP LWOP request to just LWOP.

48. From approximately December 25, 2017 through January 1, 2018, Ms. Jones continued to submit Plaintiff as Leave Without Pay ("LWOP") rather than OWCP LWOP, as Plaintiff requested.

49. In early 2018, Plaintiff's supervisors required Plaintiff to return to work sooner than her doctor's then-recommended return to work date of May 15, 2018.

50. Since January 14, 2018, Plaintiff has been required to provide medical evidence every time that she requests OWCP LWOP. Upon information and belief, other individuals (non-Hispanic, non-Puerto Rican, male, and/or no protected EEO activity) have not been similarly required to do so.

51. On or about January 16, 2018, Ms. Jones demanded a copy of her CA-17 Duty Status Report (CA-17) forms for each of her OWCP matters.

52. On or about February 8, 2018, Ms. Jones informed Plaintiff that she would be expected to email her supervisor 48 hours prior to requesting official time to work on her EEO case. Plaintiff was further required to provide her supervisor with specific details about what she would be doing during the requested time.

53. Since March 2018, Ms. Jones has regularly tried to impose an arbitrary deadline and force Plaintiff to submit her OWCP CA-7, Claim for Compensation form, before it is required or needed.

54. In January 2018, March 2018 and several other dates, Plaintiff regularly emailed Ms. Jones, with Mr. Bennett copied, complaining about the harassment she was experiencing and her concerns about further retaliation and disability discrimination.

55. In June 2018, Plaintiff was subjected to an Office of Professional Responsibility ("OPR") investigation as a result of Mr. Jack Bennett, Deputy Assistant Director, intentionally submitting false information about Plaintiff (*i.e.*, that she was not submitting accurate medical information to support her pending OWCP claims, was defrauding OWCP and was bodybuilding/engaging in bodybuilding contests while asking for OWCP LWOP). Upon information and belief, Mr. Bennett did not subject any of Plaintiff's peers (non-Hispanic, non-Puerto Rican, male, no protected EEO activity and/or no disability) to an OPR investigation. These false allegations had the potential of ending Plaintiff's career.

56. Mr. Bennett first provided this false information to the Department of Labor OWCP, who declined to investigate Mr. Bennett's claims. After they declined, Mr. Bennett again submitted the information to the ICE Joint Intake Center, who referred the allegations to the Agency's OPR. On or about August 8, 2018, an OPR Agency investigator determined the "results do not support the reported allegations" and closed the investigation. Prior to spreading this information, Mr. Bennett did not ask Plaintiff to explain the photos of her that he searched for and found on the internet.

57. Mr. Bennett also sent the false information to a Human Resources representative, who functioned as the liaison between ICE and OWCP, for the purpose of getting her OWCP benefits removed. This resulted in Plaintiff being sent by the Agency to several doctors, who confirmed her medical conditions. However, the Agency continued to send Plaintiff to different doctors, until they obtained the results they wanted – disagreement with her

diagnosed medical conditions. As a result, a substantial portion of her OWCP benefits were taken away because that was the doctor's medical information the Agency submitted to OWCP.

58. In November 2018, Plaintiff submitted the requested CA-17 forms to Ms. Jones. Ms. Jones waited until Plaintiff was in the midst of transferring from ICE ERO to ICE HSI, and erroneously but intentionally relied upon this transfer as a basis to deny them in May 2019.

59. In June 2019, Plaintiff injured her knee – suffering a meniscus tear – during the first phase of the Homeland Security Investigations Physical Fitness Test ("PFT" or "Basic Training"). Because of this injury, Plaintiff needed to wrap her knee in order to run per her doctor's instructions. However, in the midst of the training, on or about August 13, 2019, Plaintiff was required to run without wrapping her knee and reinjured her knee during a 1.5 mile run. Plaintiff was given the option of not running (which would prevent her from graduating) or run without the tape on her knee.

60. On or around August 16, 2019, Plaintiff was removed from the Basic Training course, placed on a training/medical restriction by the Agency's health unit, and returned to her regular duty station. Prior to being removed, Plaintiff verbally requested a PFT medical waiver but was prevented from submitting one in writing by the Unit Chief.

61. Because Plaintiff was required to undergo surgery to correct her knee injury, which would be a minimum recovery of one-year, Plaintiff requested a waiver from the HSI PFT on or around February 14, 2020. Plaintiff's physician had cleared her to perform all physical activities except the running portion of the PFT.

62. Upon information and belief, this waiver was denied on June 3, 2020 by Eric Feldman, Assistant Director Office of Firearms and Tactical Program.

63. Plaintiff submitted a second PFT waiver on or about October 29, 2021. The Training Review Board ("TRB" or "Board") recommended denying that waiver on or about November 22, 2021.

64. Mr. Caleb Vitello, Acting Assistant Director, GS-1801-15, again concurred with the Board's recommendation and denied Plaintiff's waiver on or about June 30, 2022.

65. The Board is comprised on Anthony Samela, Division Chief, Investigative Services (unknown protected classes – failed to provide an affidavit); Earl Mattear, Unit Chief, Undercover Operations Unit (no known disability; no known EEO activity); and Benjamin Horton, Domestic Operations Chief (no known disability; no known EEO activity).

66. Upon information and belief, Mr. Vitello and one or more of the TRB members had knowledge of Plaintiff's prior protected activity prior to denying, or recommending the denial of, her waiver requests.

67. Plaintiff's waiver requests provided the required information. Additionally, her first and second waivers were supported by Plaintiff's chain of command but they declined to submit a third waiver on her behalf. Further, Plaintiff's doctors have recommended the medical waiver for the PFT since it is a timed run.

68. At no time, did anyone from the Defendant engage with Plaintiff to discuss an alternative reasonable accommodation or seek additional information from her. Further, a waiver of a portion of the PFT would not have caused an undue hardship upon the Defendant nor

create a safety hazard because Plaintiff could perform all of the other requirement of her position and, in fact, had successfully completed the initial portion of the PFT.

69. Further, the medical waiver would have permitted Plaintiff to complete the training without undergoing knee surgery prior to graduation. Thus, there would be no negative impact to her position and she would continue working with coworkers while recovering from knee surgery post-graduation.

70. Upon information and belief, waivers had been approved for employees who had not engaged in protected EEO activity, like Plaintiff.

## VI.    CAUSES OF ACTION

**COUNT ONE**
**Title VII of the Civil Rights Act of 1964, as amended,**
**42 U.S.C. § 2000e, *et seq.***
**(Discrimination due to Race, National Origin, Sex, Color, Religion)**

71. Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

72. Plaintiff is a female Puerto Rican of Hispanic origin, dark skin color and practices Santeria, and as such, is a member of a protected class.

73. Plaintiff was subjected to materially adverse employment actions, as noted herein. Any reason proffered would not be legitimate, and it would be pretext.

74. Prior to the allegations herein being asserted, the Plaintiff's supervisors and the named officials herein were aware of Plaintiff's race (Puerto Rican), national origin (Hispanic), sex (Female), color (Dark) and religion (Santeria).

75. As an employee of Defendant, Plaintiff was treated differently and subjected to different terms and conditions of employment due to her race (Puerto Rican), national origin (Hispanic), sex (Female), color (Dark) and religion (Santeria).

76. Defendant intentionally discriminated against Plaintiff because of her race (Puerto Rican), national origin (Hispanic), sex (Female), color (Dark) and religion (Santeria).

77. Defendant limited, segregated and classified Plaintiff in a way which deprived her of employment opportunities because of her race (Puerto Rican), national origin (Hispanic), sex (Female), color (Dark) and religion (Santeria).

78. Upon information and belief, other employees who were similarly situated have received different terms and conditions of employment.

79. By discriminating against Plaintiff for her race (Puerto Rican), national origin (Hispanic), sex (Female), color (Dark) and religion (Santeria). Defendant acted with malice or with reckless or callous indifference.

**COUNT TWO**
**Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.***
**Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701, *et seq.***
**(Retaliation)**

80. Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

81. Plaintiff engaged in protected activity by regularly raising her concerns to her leadership, the EEO office and the EEOC about the harassment and disparate treatment to which she was being subjected.

82. Plaintiff was subjected to retaliatory adverse employment actions, as noted herein.

83. Prior to the allegations herein being asserted, Defendant was aware of Plaintiff's protected activity.

84. Defendant took these actions against Plaintiff due to her protected activity.

85. Defendant intentionally attempted to punish Plaintiff and discourage others like her because of her protected activity.

86. Defendant limited, segregated and classified Plaintiff in a way which deprived her of employment opportunities because of her protected activity.

87. Upon information and belief, other employees who were similarly situated have received different terms and conditions of employment.

88. Plaintiff has incurred significant loss, including loss of reputation and loss of career opportunities now and into the future, and all the other losses stated without Plaintiff contributing in any way thereto.

### COUNT THREE
**Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e,** *et seq.*
**Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701,** *et seq.*
**(Hostile Work Environment)**

89. Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

90. As a result of Plaintiff's protected statuses, Plaintiff's leadership engaged in a persistent pattern of severe and pervasive harassment as set forth herein, which created a hostile and offensive workplace environment.

91. Plaintiff was regularly and continually subjected to harassing conduct as noted herein, which created a hostile and abusive work environment.

92. Plaintiff believes that she was subjected to a hostile work environment based on race (Puerto Rican), national origin (Hispanic), sex (Female), color (Dark), religion (Santeria), disability (physical) and/or engagement in prior protected EEO activity.

93. Defendant's unlawful conduct was unwelcome.

94. Defendant's deliberate conduct of the adverse actions referred to throughout this Complaint created a hostile and abusive work environment.

95. Plaintiff was subjected to harassment because of her protected status(es), and it unreasonably interfered and affected a term, condition, or privilege of Plaintiff's employment.

96. Defendant knew or should have known of the harassment. Defendant failed to adequately investigate the harassment and took no effective, immediate or remedial action. Despite Plaintiff's complaints, the harassment continued unabated.

97. By failing to take appropriate and effective remedial action against Plaintiff's supervisor, Defendant acted with malice or with reckless or callous indifference to Plaintiff's complaints.

98. As a direct and proximate cause of Defendant's conduct alleged in this Complaint, Plaintiff suffered, and continues for suffer, from harm, injury and monetary damages - including but not limited to past and future loss of income, benefits, career opportunities, expenses and costs – and is entitled to all available legal and equitable remedies.

99. Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and her injury is permanent in nature.

100. Plaintiff has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all of the other losses stated without Plaintiff contributing in any way thereto.

## COUNT FOUR
### Rehabilitation Act of 1973, as amended,
### 29 U.S.C. § 701, *et seq.*
### (Discrimination based on Disability and Failure to Accommodate)

101. Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

102. Plaintiff suffers from lower back injuries, injuries to her right arm and injury to her right knee, and as such, is a member of a protected class.

103. Plaintiff is a qualified individual with a physical disability.

104. The medical documentation that Plaintiff provided to Defendant showed that her medical conditions substantially limited major life activities; such as running, walking and sitting for extended periods of time.

105. Plaintiff's physical disability entitled her to reasonable accommodation under the Rehabilitation Act.

106. Plaintiff or his physician repeatedly informed her supervisors of her medical conditions and made repeated requests to Defendant that she needed reasonable accommodation.

107. Defendant was unwilling to assist Plaintiff in receiving her reasonable accommodation.

108. The reasonable accommodation requested by Plaintiff would not have caused an undue burden or hardship on Defendant.

109. Defendant's failure to provide Plaintiff the reasonable accommodation requested deprived Plaintiff of the opportunity to be as productive as her co-workers in the same work environment.

110. Plaintiff's medical conditions are long-term and/or permanent.

111. At the time of the adverse employment actions asserted herein, Plaintiff had the necessary knowledge, skills and experience to successfully perform the duties and responsibilities

of her position with or without a reasonable accommodation. Indeed, Plaintiff has been successfully performing the duties of a HIS Special Agency position since November 2018, including meeting the physical demands for the position.

112. Plaintiff was subjected to materially adverse employment actions, as noted herein. Any reason proffered would not be legitimate, and it would be pretext.

113. Prior to the allegations herein being asserted, Defendant was aware of Plaintiff's physical disability.

114. As an employee of Defendant, Plaintiff was treated differently and subjected to different terms and conditions of employment due to her physical disability.

115. Defendant intentionally discriminated against Plaintiff because of her physical disability.

116. Defendant limited, segregated and classified Plaintiff in a way which deprived her of employment opportunities because of her physical disability.

117. Upon information and belief, other employees who were similarly situated have received different terms and conditions of employment.

118. By discriminating against Plaintiff for her physical disability, Defendant acted with malice or with reckless or callous indifference.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Honorable Court:

  a. Award compensatory damages permitted by statute;

  b. Award all lost compensation, including wages, overtime and retirement contributions;

  c. Damages and equitable relief for all harm Plaintiff has sustained as a result of Defendant's unlawful conduct;

  d. Award reasonable attorney fees, costs, and expenses incurred for this action;

  e. Order Defendant to expunge any relevant adverse action in the Plaintiff's employment file;

  f. Order Defendant to institute a policy and procedure to be implemented against discrimination;

  g. Equal Employment Opportunity training for Defendant and the supervisory officials at issue herein;

  h. Supervisory training for the supervisors at issue herein;

  i. Award equitable, declaratory, and injunctive relief; and

  j. Award such other and further relief as this Honorable Court deems just and proper.

## EQUITABLE RELIEF

119. Plaintiff hereby incorporates, by reference hereto, the facts, law, and/or allegations contained within the preceding paragraphs, as fully set forth herein.

120. Because of the actions alleged herein, the continued employment of the supervisors at issue herein without training in equal employment opportunity law, rules and regulations, present clear and present dangers to the employees of Defendant and could result in further illegal actions on the party of Defendant, by and through its agents, servants and employees.

121. Because of the damage posed by forcing Plaintiff to continue to work in while being undercompensated, Plaintiff respectfully asks this Court to order Defendant to undertake all efforts to ensure it eliminates all failures in its obligations to employees such as Plaintiff.

**WHEREFORE**, Plaintiff respectfully prays that this Honorable Court:

  a. Order the Defendant to institute a policy and procedure to be implemented against discrimination;

b. Equal Employment Opportunity training for Defendant and the supervisory officials at issue herein;

c. Supervisory training for the supervisors at issue herein; and

d. Such other and further relief as this Court deems just and proper.

## JURY DEMAND

122. Plaintiff demands a trial by jury on all issues set forth herein.

Respectfully submitted,

*A Marques Pitre, Esq.*

_____
A. MARQUES PITRE
    (D.C. Bar No 503119)
Pitre & Associates, LLC
Ronald Reagan Building and
International Trade Center
1300 Pennsylvania Avenue, N.W.
Suite 700
Washington, DC 20004
Phone: 202-204-3006
Email: ampitre@ampitreassociates.com

May 30, 2023                                            *Counsel for Plaintiff*